**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MICHAEL MOHAMMED LEE, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No.  13-0486 |
| | : | |
| MAJOR ABELLOS, et al., | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

**ROBERT F. KELLY, Sr. J.**                           **DECEMBER 10, 2014**

Presently before the Court is Defendants, City of Philadelphia (the "City"), Commissioner Louis Giorla ("Defendant Giorla"), Deputy Commissioner Clyde Gainey ("Defendant Gainey"), Warden John Delaney ("Defendant Delaney"), Deputy Warden Frederick Abellos ("Defendant Abellos"), Deputy Warden Gerald May ("Defendant May"), Correctional Lieutenant Elizabeth Henry ("Defendant Henry"), Correctional Sergeant Brown ("Defendant Brown"), and Dr. Bruce Herdman's ("Defendant Dr. Herdman";) (collectively, the "Municipal Defendants"), Motion for Summary Judgment against Plaintiff, Michael Mohammed Lee ("Plaintiff"), Plaintiff's Response, and the City and Municipal Defendants' Reply.  For the reasons stated below, the Motion is granted in its entirety.

## I.      BACKGROUND

### A.      The Parties

Plaintiff is an adult male resident of the Commonwealth of Pennsylvania.  Sec. Am. Compl. ¶ 7.  At all times relevant to this litigation, Plaintiff was imprisoned at the Curran-

Fromhold Correctional Facility ("CFCF") in Philadelphia, Pennsylvania.  Id.

Defendant Abellos, is a Deputy Warden at CFCF.  Id. ¶ 8.  Defendant Giorla is the Commissioner of the Philadelphia Prison System ("PPS").[1]  Id. ¶ 9.  Defendant Delaney was the Warden at CFCF.  Id. ¶ 11.  Defendant May is a Deputy Warden at CFCF.  Id. ¶ 13.  Defendant Henry is a Lieutenant at CFCF.  Id. 14.  The City is a municipality organized by and through the Commonwealth of Pennsylvania that manages the PPS and employs the previously mentioned Defendants.  Id. ¶ 19.  Defendant Dr. Herdman is the Chief Medical Officer of the PPS.  Id. ¶ 10.  Defendant Brown[2] is a PPS correctional officer at CFCF.[3]  Id. ¶ 17.

**B.    Plaintiff's Claims**

While incarcerated at CFCF, Plaintiff alleges that: (1) he was injured in attacks by several correctional officers; (2) he suffered injuries while getting down from the top bunk of his

---

[1]All claims against the PPS were dismissed on August 23, 2013, (See Doc. No. 30), because "[a]ll suits growing out of [PPS'] transactions . . . shall be in the name of the City of Philadelphia."  53 P.S. § 16257; see also Baylor v. Phila. Prison System, No. 10-1468, 2010 WL 3191803, at *1 (E.D. Pa. Aug. 11, 2010); Griffith v. Phila. Prison Systems, No. 99-6338, 2001 WL 876804, at *1 (E.D. Pa. May 18, 2001).

[2]Plaintiff also named as Defendants the following: (1) "Whittaker," a PPS Major at CFCF.  Sec. Am Compl. ¶ 15; (2) "Moore," a PPS Major at CFCF.  Id. ¶ 16; (3) "Washington," a PPS correctional officer.  Id. ¶ 18; (4) Corizon Health, Inc. ("Defendant Corizon") who held a contract to provide all medical services to inmates in the PPS.  Id. ¶ 20; (5) Richard Hallworth, the CEO of Defendant Corizon.  Id. ¶ 21; (6) Rebecca Pinney, Chief Nursing Officer at Defendant Corizon.  Id. ¶ 22; (7) Geoff Perselay, a Senior Vice President at Defendant Corizon.  Id. ¶ 23; (8) Mary Silva, a Vice President at Defendant Corizon.  Id. ¶ 24; (9) Dr. Eke Kalu, a Regional Medical Director at Defendant Corizon.  Id. ¶ 25; (10) Latasha Deer, a Health Service Administrator at Defendant Corizon.  Id. ¶ 26; (11) Brandon DeJulius, a Regional Medical Director at Defendant Corizon.  Id. ¶ 27; (12) Helen Sarskaya ("Defendant Sarskaya"), a nurse or physician assistant employed by Defendant Corizon.  Id. ¶ 29; and (13) Dr. Bruce Blatt (Defendant Dr. Blatt"), a medical doctor, employed by Defendant Corizon (collectively, the "Corizon Defendants").  Id. ¶ 27.

[3]Defendants, Mary Silva, Latasha Deer, and Brandon DeJulius were dismissed by stipulation of the parties on August 26, 2014.  (See Doc. No. 52.)  Defendants, Melvin Whittaker, Marcella Moore, and Freddie Washington were dismissed by stipulation of the parties on August 27, 2014.  (See Doc. No. 54.)

required sleeping area, which did not have a safety ladder; (3) he received inadequate medical treatment for his injuries; and (4) he suffered retaliation and harassment for his filing of grievances and the current lawsuit.  Id. ¶¶ 73, 80-84, 107, 135.  Plaintiff's claims are brought pursuant to 42 U.S.C. §§ 1981, 1982, 1983, 1985(3), 1986, 1988, and the First, Fifth, Eighth and Fourteenth Amendments to the United States Constitution.  Id. ¶ 1.  Plaintiff seeks injunctive relief, declaratory relief, damages and punitive damages against all Defendants for the alleged violations of his civil rights.  Id.

Specifically, Plaintiff asserts the following allegations against the Municipal Defendants: On September 8, 2012, while incarcerated at CFCF, he was attacked by several correctional officers after returning from a counseling session with a health professional.  Id. ¶ 38.  This attack was witnessed by several supervisory correctional officers, and caused Plaintiff injuries to various parts of his body.  Id.  On December 22, 2012, Plaintiff injured his knee getting off the top bunk at CFCF.  Id. ¶ 44.  On this same date, he made a "Sick Call Request" stating that his knee was swollen and he was in pain.  Id. ¶ 45.  He also made Sick Call Requests on December 23, 25 and 30, 2012, and was not given any medical treatment from December 22, 2012, through January 9, 2013.  Id. ¶¶ 46-50.  During that time, Plaintiff was compelled to continue sleeping on the top bunk because Defendant Corizon's medical staff would not give him a bottom bunk accommodation.  Id. ¶ 51.

On January 9, 2013, Plaintiff again injured his knee getting off the top bunk.  Id. ¶ 52. On January 10, 2013, Plaintiff had an x-ray taken of his left knee which revealed a knee injury. Id. ¶ 53.  Plaintiff was seen by Defendant Dr. Blatt who did not provide any medical treatment for his alleged serious orthopedic injury.  Id. ¶ 55. Between January 10, 2013 and February 20,

2013, Plaintiff injured his left knee several more times getting off the top bunk, and the Corizon Defendants did not allow him a bottom bunk accommodation.  Id. ¶¶ 60-61.  On February 20, 2013, Plaintiff made a Sick Call Request stating that he hurt his knee again getting off the top bunk and was in "bad pain."  Id. ¶ 62.  On April 30, 2013, an MRI of Plaintiff's left knee was conducted and showed a tear in his meniscus.  Id. ¶ 63.  The Corizon Defendants intentionally delayed his request to have an orthopedic consultation because of this instant lawsuit against them.  Id. ¶ 67.  In addition, Defendant Sarskaya failed to provide any medical treatment for his injury.  Id. ¶ 68.

Plaintiff further contends that because Plaintiff filed grievances and this current lawsuit, he was harassed and threatened by Defendants, Abellos, Henry, May, Washington, and Brown, including being violently choked by Defendant Brown.  Id. ¶¶ 74-78.  Plaintiff states that he filed a grievance in response to Defendant Brown's actions, and in retaliation, his cell was ransacked by Defendant Washington, and his legal papers taken.  Id. ¶¶ 81-82.  It is further alleged that Defendants, Abellos, Henry, May, and Brown and other correctional officers conspired to assault, harass, threaten, intimidate, and retaliate against Plaintiff.  Id. ¶¶ 85-90.

In the Second Amended Complaint, Plaintiff alleges:

> (1) "Violations of constitutional amendments, civil rights and other federal laws" against the Municipal Defendants (Count 1).  Under this Count, Plaintiff asserts that the Municipal Defendants, under color of state law, and pursuant to an unconstitutional custom, policy, and practice: (a) acted with intentional and willful deliberate indifference to his constitutional rights; (b) failed to provide the bunk beds with ladders when they were aware of the risks of serious injuries to inmates; (c) failed to provide prompt and adequate healthcare for his serious medical needs; (d) retaliated against him for his religious beliefs in violation of the First and Fourteenth Amendments; (e) assaulted him in violation of his constitutional rights; and (f) failed to supervise its employees and private

4

contractors at PPS.  Sec. Am. Compl. ¶¶ 95-96;

(2)  "Violations of constitutional amendments, civil rights and other federal laws" against the Corizon Defendants (Count 2).  Under this Count, Plaintiff asserts that the Corizon Defendants, under color of state law, and pursuant to an unconstitutional custom, policy, and practice:  (a) acted with intentional and willful deliberate indifference to his constitutional rights; (b) failed to provide prompt and adequate healthcare for his serious medical needs; (c) retaliated against him for his religious beliefs in violation of the First and Fourteenth Amendments; (d) failed to supervise its executives and employees at PPS for many years, and failed to take corrective action of known misconduct; (e) Defendant Dr. Blatt acted with deliberate indifference to his serious medical needs; and (f) Defendant Sarskaya acted with deliberate indifference to his serious medical needs.  Id. ¶¶ 97-98;

(3) "State Created Danger" against the Municipal Defendants (Count 3). Plaintiff alleges that the "Municipal Defendants contracted with Defendant Corizon to provide health care services that the Municipal Defendant knew or should have known Defendant Corizon was not qualified to provide or would not provide in a lawful manner."  Id. ¶ 100;

(4) State law claim [of] corporate negligence against the Corizon Defendants (Count 4).  Plaintiff alleges that "Corizon and its employees at PPS, such as Defendants Silva, Kalu, Blatt, and Helen," in negligently and recklessly examining and treating him, violated their duty of care to him. Id. ¶¶ 104-106;

(5)  State law claim [of] premises liability against the City (Count 5). Plaintiff alleges that it is the policy of the City to use bunk beds without ladders at the PPS knowing that inmates were suffering "serious orthopedic and other life threatening injuries."  Id. ¶¶ 109-111;

(6)  State law claim [of] assault and battery" against Defendants, Henry, May, Abellos, Brown, and Washington (Count 6).  Id. ¶¶ 114-115; and

(7)  State law claim of intentional infliction of emotional distress against all Defendants (Count 7).  Id. ¶¶ 118-119.

## C.    Procedural History

On January 30, 2013, Plaintiff filed a pro se civil rights action against Defendants

Abellos, Delaney, and May.  (See Doc. No. 3.)  After obtaining the representation of Geoffrey

Seay, Esquire, Plaintiff filed a Motion for Leave to File an Amended Complaint, which this

Court granted on June 12, 2013.  (See Doc. Nos. 13, 16.)  The subsequent Amended Complaint

added eighteen Defendants, as named above, and spanned forty-nine pages with approximately

two hundred and sixty-seven paragraphs.  See Am. Compl.  Both the Municipal and Corizon

Defendants filed Motions to Dismiss and argued that the Amended Complaint failed to comport

with the requirements of Federal Rule of Civil Procedure 8.[4]  (See Doc. Nos. 19, 21.)  We agreed

and granted the Motions, but granted Plaintiff leave to file another Amended Complaint.  (See

Doc. No. 29.)  Plaintiff filed a Second Amended Complaint on September 5, 2013.  (See Doc.

No. 31.)  The Municipal Defendants and the City filed the instant Motion for Summary Judgment

on August 28, 2014.  (Doc. No. 55.)  Plaintiff filed a Response, and the Municipal Defendants

submitted a Reply.  (Doc. Nos. 75, 78.)

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) states that summary judgment is proper "if there is

no genuine issue as to any material fact and the moving party is entitled to judgment as a matter

of law."  See Hines v. Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991).  The Court asks

"whether the evidence presents a sufficient disagreement to require submission to the jury or

whether . . . one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 251-52 (1986).  The moving party has the initial burden of informing the court of the

basis for the motion and identifying those portions of the record that demonstrate the absence of

---

[4]The Federal Rules require that a complaint set forth a "short and plain statement of the claim" whereby "each allegation must be simple, concise and direct."  Fed. R. Civ. P. 8(a)(2) and (d)(1).

a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "A fact is material if it could affect the outcome of the suit after applying the substantive law.  Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'"  Compton v. Nat'l League of Prof'l Baseball Clubs, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); see Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992).  "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a summary judgment motion.  Tziatzios v. United States, 164 F.R.D. 410, 411-12 (E.D. Pa. 1996).  If the court determines that there are no genuine issues of material fact, then summary judgment will be granted.  Celotex, 477 U.S. at 322.

## III.    DISCUSSION

### A.    Prison Bunks Without Ladders

Plaintiff first avers that the City and the Municipal Defendants were aware of the risk of serious injury to inmates in not providing safety ladders for prison bunk beds, but failed to provide such ladders.  Sec. Am. Compl. ¶ 96.  To prevail in a § 1983 action, a plaintiff must demonstrate that: "(1) the defendants acted under color of law; and (2) their actions deprived [the

plaintiff] of rights secured by the constitution or federal statutes." Anderson v. Davila, 125 F.3d 148, 159 (3d Cir. 1997). As to the first element, it is undisputed that the alleged incident occurred while Plaintiff was an inmate at CFCF, and thus, any actions or inactions by the Municipal Defendants were under color of state law. See West v. Atkins, 487 U.S. 42, 49 (1988). As to the second element, however, Plaintiff fails to demonstrate that requiring ladders for inmate bunk beds is a constitutional right.

Courts in this District have repeatedly held that the failure to provide prisoners with a ladder to reach the top bunk of a bunk bed is not sufficiently serious to rise to the level of a constitutional violation. See Williams v. Corizon, No. 12-2412, 2013 WL 4787223, at *15 (E.D. Pa. Sept. 9, 2013); Nixon v. Moore, No. 13-0644, 2013 WL 692643, at *1 (E.D. Pa. Feb. 25, 2013); Diaz v. Arnold, No. 12–6754, 2013 WL 334796, at *1 (E.D. Pa. Jan. 28, 2013). Moreover, even assuming, per arguendo, that prison officials were negligent because Plaintiff's bunk bed did not have a ladder, negligent conduct which causes unintended injury to an inmate does not amount to a constitutional violation. See Davidson v. Cannon, 474 U.S. 344, 347 (1986); Daniels v. Williams, 474 U.S. 327, 328 (1986). Thus, this claim is without merit, and summary judgment is granted as to this cause of action.[5]

## B. Eighth Amendment Claim

Plaintiff next claims that the Municipal Defendants were "deliberately indifferent" to his serious medical needs in violation of his Eighth Amendment rights. Sec. Am. Compl. ¶ 96. The

---

[5]We note that Plaintiff was approved for "Bottom Bunk Accommodation" on January 9, 2013, which was to end on March 9, 2013. (Defs.' Mot. Summ. J. , Ex. X.) Plaintiff was again approved for "Bottom Bunk Accommodation" from April 13, 2013 until July 9, 2013. (Id., Ex. Y.) This approval was signed by Defendant Dr. Blatt. (Id.)

Eighth Amendment's proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care.  Estelle v. Gamble, 429 U.S. 97 (1976).  The Estelle Court determined that, in order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.  Id. at 106.  Therefore, to succeed under these principles, Plaintiff must demonstrate: (1) that the Municipal Defendants were deliberately indifferent to his medical needs, and (2) that those needs were serious.  Id.

It is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute "deliberate indifference."  Id.  As the Estelle Court noted: "[i]n the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'"  Id. at 105; see also Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999); Durmer v. O'Carroll, 991 F.2d 64, 67 (3d Cir. 1993).  "Deliberate indifference," therefore, requires "obduracy and wantonness,"  Whitley v. Albers, 475 U.S. 312, 319 (1986), which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk.  Farmer v. Brennan, 511 U.S. 825, 842 (1994).

The Court of Appeals for the Third Circuit ("Third Circuit") has found "deliberate indifference" in a variety of circumstances, including where a prison official: (1) knows of a prisoner's need for medical treatment, but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment.  Durmer, 991 F.2d at 68.

9

### 1. Serious Medical Need

We initially address the issue of whether Plaintiff's left knee injury constituted a serious medical need. A "serious medical need" is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Johnson v. Stempler, 373 F. App'x 151, 153 n.1 (3d Cir. 2010) (citing Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987)). We first find that Plaintiff's left knee condition did not constitute a serious medical need during the period from December 22, 2012, when he first reported that he hurt his knee, until early April 2013, when he was referred for an MRI.

The record indicates that Plaintiff submitted a Sick Call Request to CFCF officials on December 22, 2012, stating that he hurt his knee getting out of the top bunk, and that his knee was swollen and that he was in pain. (Defs.' Mot. Summ. J., Ex. H.) He submitted another Sick Call Request on December 23, 2012, stating that he had injured his knee. (Id., Ex. I.) Plaintiff was scheduled to see medical personnel at CFCF on December 26, 2012.[6] (Id.) However, the appointment was cancelled and rescheduled because Plaintiff had a court appearance on that day.[7] (Id., Ex. O.) Plaintiff was seen by prison health care personnel on January 9, 2013. (Id., Ex. P.)

Plaintiff was then, subsequently, sent for an x-ray of his left knee on January 10, 2013, to

---

[6]Plaintiff acknowledged that he was seen at the prison asthma clinic on December 24, 2012, and was given medication for his throat "closing up." (Id., Ex. B, Lee Dep. ("Lee Dep."), at 74-75.) There is no indication in the record that Plaintiff reported a knee injury at this time. (Id.)

[7]Plaintiff also submitted Sick Call Requests on December 25, 2012, and December 30, 2012, stating that he "twisted [his] knee getting off the top bunk." (Id., Exs. J-K.)

be conducted by an outside medical provider, Bustleton Radiology Associates (Bustleton Radiology).  (Id., Exs. P-Q.)  Dr. Anthony Limberakis of that facility reported that "AP and lateral views of the left knee show no evidence of fracture, dislocation or intrinsic bone disease. Prominence of the suprapatellar soft tissues is noted suggesting suprapatellas bursitis[8] and/or synovitis."  (Id., Ex. Q.)  Dr Limberakis' impression was "[n]o fracture, dislocation or arthropathy detected."  (Id.)

The next medical document in the record regarding Plaintiff's knee problem is from February 20, 2013, when Plaintiff made a Sick Call Request stating that he "hurt myself getting out of bed."  (Id., Ex. M.)  Plaintiff was then seen by the prison medical staff on February 26, 2013.  (Pl.'s Resp., Ex. 27.)   On this date, Jean Pantal ("Pantal"), a nurse for Defendant Corizon, submitted a Utilization Management Referral Review Form requesting a "routine"[9] orthopedic office visit for Plaintiff's bursitis.  (Id., Ex. 27.)  Progress Notes[10] from this date indicate that Plaintiff had a "clicking noise" in his left knee.  (Id., Ex. 28.)  However, the Notes also state that Plaintiff "denies any recent injury," and reports that Plaintiff was "ambulatory" with "no limp," and was "negative" for "swelling."  (Id.)  He also had "no edema," and was negative for "pain on palpation."  (Id.)  The next document of record is from April 9, 2013, when Defendant Dr. Blatt referred Plaintiff for an MRI of the left knee.  (Defs.' Mot. Summ. J., Ex. S.)

---

[8]Bursitis-" inflammation of a bursa, occasionally accompanied by a calcific deposit in the underlying supraspinatus tendon."  Dorland's Illustrated Medical Dictionary, 28th Edition, 1994, p. 240.

[9]This form contains boxes for a "routine" or "urgent" referral.  Pantal checked off "routine." (Pl.'s Resp., Ex. 27.)

[10]Because these Progress Notes are handwritten and often difficult to read, we make our best attempt to set forth what they state.

As stated above, we are of the opinion that Plaintiff's left knee condition from the time he reported an injury on December 22, 2012, up until April 9, 2013, did not constitute a serious medical need.  As noted, the x-ray taken on January 10, 2013, revealed "no evidence of fracture, dislocation, or intrinsic bone disease," but only evidence "suggesting" bursitis.  (Id., Ex. Q.) Plaintiff has presented no evidence that this condition seriously limited him in any way at this time; nor, has he offered any case law supporting a determination that bursitis constitutes a serious medical need.  Likewise, when Plaintiff was seen again for a left knee injury on February 26, 2013, Progress Notes reported that Plaintiff was "ambulatory" with "no limp," was "negative" for "swelling," and was "negative for pain upon palpation."  (Pl.'s Resp., Ex. 28.) Thus, we find that the record does not support a serious medical need during this time. Accordingly, Plaintiff has failed to establish that he had a serious medical need during this time period; therefore, we are not required to address the question of whether the Municipal Defendants were deliberately indifferent to his knee condition at that time.  See Estelle, 429 U.S. at 106.

However, we do find that Plaintiff's knee condition did constitute a serious medical need as of April 9, 2013, when Plaintiff was referred for an MRI.  (Defs.' Mot. Summ. J., Ex. S.)  In addition, an Inmate Injury Report dated April 12, 2013, indicated that Plaintiff reported that he "slipped and fell injuring his left knee."  (Pl.'s Resp., Ex. 13.)  Plaintiff had an MRI of the left knee conducted on April 30, 2013, by Bustleton Radiology.  (Defs.' Mot. Summ. J., Ex. T.)  The report stated the results as: "[m]ild arthritic change.  Complex tear of the posterior horn and body

segment of the medial meniscus[11] and of the lateral meniscus.  Anterior cruciate ligament tear

which may be chronic.  Small joint effusion."  (Id.)

### 2. Deliberate Indifference

Having found that Plaintiff's knee condition constituted a serious medical need at this

time in April 2013, we move on to the issue of whether the Municipal Defendants were

deliberately indifferent to this serious medical need.  "Mere disagreement as to the proper

medical treatment" is "insufficient" to amount to deliberate indifference.  Spruill v. Gillis, 372

F.3d 218, 235 (3d Cir. 2004) (quoting Monmouth Cnty., 834 F.2d at 346.)  Moreover, prison

medical authorities are "afford[ed] considerable latitude . . . in the diagnosis and treatment of the

medical problems of inmate patients," and "negligence in the administration of medical treatment

to prisoners is not itself actionable under the Constitution."  Inmates of Allegheny Cnty. Jail v.

Pierce, 612 F.2d 754, 762 (3d Cir. 1979).  Therefore, to defeat a motion for summary judgment,

Plaintiff "must present enough evidence to support the inference that the defendants are

knowingly and unreasonably disregarding an objectively intolerable risk of harm."  Heggenmiller

v. Edna Mahan Corr. Inst. for Women, 128 F. App'x 240, 246-47 (3d Cir. 2005) (quoting

Beers–Capitol v. Whetzel, 256 F.3d 120, 132 (3d Cir. 2001)).

Although courts "will generally not find deliberate indifference when some level of

medical care has been offered to the inmate," Christy v. Robinson, 216 F. Supp. 2d 398, 413-15

(D. N.J. 2002), the Third Circuit has explained that "deliberate indifference to serious medical

needs" may include denial of "reasonable requests for medical treatment" by prison authorities

---

[11]Meniscus (medial)- "a crescent-shaped disk of fibrocartilage attached to the medial margin of
the superior articular surface of the tibia."  Dorland's, supra. at 1013.

when either "such denial exposes the inmate to undue suffering or the threat of tangible residual injury" or "knowledge of the need or medical care is accompanied by the . . . intentional refusal to provide that care." Id. (quoting Monmouth Cnty., 834 F.2d at 346). "Short of absolute denial, if necessary medical treatment is delayed for non-medical reasons, a case of deliberate indifference has been made out." Monmouth Cnty., 834 F.2d at 346. However, "misdiagnosis or preference for a certain type of treatment will not alone rise to the level of deliberate indifference." Christy, 216 F. Supp. 2d at 413 (citing United States ex rel. Walker v. Fayette Cnty., 599 F.2d 573, 575 (3d Cir. 1979)); see also Estelle, 429 U.S. at 106.

Here, we are of the opinion that the record before us establishes that the Municipal Defendants were not deliberately indifferent to Plaintiff's knee condition. The record reflects that Plaintiff did receive medical attention and care for his knee condition. Initially, at this time in April 2013, the Municipal Defendants provided care for Plaintiff by sending him for an outside MRI in response to his knee complaints. Furthermore, subsequent to the MRI, Plaintiff continued to receive adequate medical attention for his knee condition.

As noted, the record contains several medical forms from CFCF that have handwritten notations which are difficult to understand. However, it is clear that Plaintiff was seen by Defendant Dr. Blatt on May 3, 2013, for his knee problem. (Defs.' Mot. Summ. J., Ex. U.) This note indicates that Plaintiff had an MRI which showed a meniscus tear, and that Plaintiff was scheduled for an orthopedic examination on August 16, 2013, at the orthopedic department of Mercy Hospital in Philadelphia. (Id.) It is notable at this time that Plaintiff claims that he never saw an orthopedic specialist based on Pantel's Utilization Management Referral Review Form. (Pl.'s Resp., Statement of Facts at ¶ 71.) In fact, Plaintiff asserts that "[w]hile imprisoned at PPS

14

from December 22, 2012 until January 10, 2014, more than 365 days, [he] never saw an orthopedic specialist for his 'left knee complex mechanical injury.  Chronic ACL tear.  Medial and lateral meniscus tear.'"  (Id. at ¶ 81.)  However, the record is clear that Plaintiff was examined by an orthopedic specialist at Mercy Orthopedics on August 16, 2013.  (Defs.' Mot. Summ. J., Ex. V.)  The report from this examination stated that Plaintiff had "no swelling or effusion," and that "bracing may be an option."  (Id.)  The report also recommended that Plaintiff be referred to a University hospital for further evaluation, and noted that Plaintiff's injury "did not likely happen falling out of bed."[12]  (Id.)  Moreover, Plaintiff admitted at his deposition that he did go to Mercy Hospital to see an orthopedist.  (Lee Dep. at 86.)  Plaintiff testified that the orthopedist at the hospital told him that he would give the prison "tips" on how to treat the condition, but that is all he did for him.[13]  (Id.)

Another prison form which is dated August 23, 2013, indicates that Plaintiff was again seen by prison medical personnel for his knee condition.  (Id., Ex. W.)  It is unclear from the handwritten notations on this form whether Plaintiff was being referred to Temple Orthopedics or had already been seen by them.[14]  (Id., Ex. W.)  However, regardless of whether Plaintiff was seen at Temple or not, the record indicates that Plaintiff was receiving adequate medical attention

---

[12]In addition, on this same date, Dr. Stephen Wiener ordered a "neoprene sleeve" for Plaintiff's knee to be used for six months.  (Pl.'s Resp., Ex. 29.)

[13]It is notable that during this time, Plaintiff was being continually treated by the prison medical staff for asthma.  Plaintiff was seen by a nurse on May 3, 2013, for complaints of shortness of breath. (Def. Corizon's Mot. Summ. J., Ex. E at D-7A 043-044)  Plaintiff was also seen in the Chronic Care Clinic at the prison for shortness of breath on July 1, 2013, and August 28, 2013.  (Id. at D-7A 045, 046, 052.)  He was also prescribed medication for this condition on September 5, 2013.  (Pl.'s Resp., Ex. 30.)

[14]Under a section of this form entitled "Previous treatment and response," the name Temple Orthopedics was written.  (Defs.' Mot. Summ. J., Ex. W.)

for his knee condition, which contravenes any claim of deliberate indifference. Plaintiff did acknowledge that he received a knee sleeve, but claims that it was not the proper size. (Lee Dep. at 82.) Plaintiff was also seen by Nurse Practitioner K. Martin on November 18, 2013, for his left knee problem and was provided with a knee support. (Pl.'s Resp., Ex. 30.)

In light of the above, we are of the opinion that the Municipal Defendants were not deliberately indifferent to Plaintiff's knee condition. We find that the allegations of Plaintiff are, at best, assertions of negligence or malpractice which do not amount to deliberate indifference. See Estelle, 429 U.S. at 106. As noted earlier, deliberate indifference requires "obduracy and wantonness." Whitley, 475 U.S. at 319. Here, Plaintiff has failed to present evidence meeting this standard. Moreover, Plaintiff has failed to provide any evidence that any alleged delay or deficiency in care led to an adverse effect on his knee condition. For all these reasons, Plaintiff's claim of deliberate indifference is without basis in the record. Accordingly, we grant the Municipal Defendants summary judgment on this cause of action.

### C. Retaliation

Plaintiff also makes several retaliation claims against the Municipal Defendants. We first note that we agree with the Municipal Defendants that Plaintiff's Complaint is somewhat disorganized in making his retaliation claims. In several parts of his Complaint, Plaintiff alleges that the Municipal Defendants engaged in numerous illegal acts, which were all in retaliation for his filing of grievances, complaints, and this instant lawsuit. Sec. Am. Compl. ¶¶ 5, 38-41, 60, 67, 74, 76-77, 81-85, 87-92, 96(c). Plaintiff asserts that, at various times over the course of his imprisonment at CFCF, the Municipal Defendant caused his grievances to be thrown away, physically attacked him, refused to let him sleep on the bottom bunk, refused him medical care,

16

threatened and harassed him, ransacked his cell, confiscated legal and religious materials, intercepted and interfered with his phone calls, refused him a prison job, and told other inmates that he was a "snitch."  Id.  We address each of these claims of retaliation below.

To establish a prima facie case of retaliation, Plaintiff must demonstrate: "(1) constitutionally protected conduct, (2) an adverse action by prison officials sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the exercise of his constitutional rights and the adverse action taken against him." Thompson v. Pitkins, 514 F. App'x 88, 90 (3d Cir. 2013) (quoting Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003)); see also Moore v. City of Phila., 461 F.3d 331, 341-42 (3d Cir. 2006); Williams, 2013 WL 4787223, at *16.  The burden is on Plaintiff to show that "the constitutionally protected conduct was a substantial motivating factor in Defendants' conduct." Verbanik v. Harlow, 512 F. App'x 120, 122-23 (3d Cir. 2013) (citing Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001)); Williams, 2013 WL 4787223, at *16.  "If a plaintiff can establish a prima facie case of retaliation the burden shifts to the defendant to demonstrate that even without the impetus to retaliate he would have taken the action complained of."  Id. (quoting Hartman v. Moore, 547 U.S. 250, 260 (2006)).

"To satisfy the third element, a plaintiff must allege that the exercise of his constitutional rights was a substantial and motivating factor in the decision to take adverse action against him." Frazier v. Daniels, No. 09-3612, 2010 WL 2040763, at *10 (E.D. Pa. May 20, 2010); Booth v. Pence, 354 F. Supp. 2d 553, 560 (E.D. Pa. 2005) (quoting Rauser, 241 F.3d at 333-34).  "If a prisoner sufficiently establishes a causal connection, prison officials may 'overcome this element by demonstrating that the same action would have been taken in the absence of the protected

17

activity.'"  Rauser, 242 F.3d at 34.

Here, the first prong of the § 1983 retaliation test is not in dispute because Plaintiff engaged in constitutionally protected conduct by filing this lawsuit and submitting grievances at CFCF.  We are of the opinion, however, that Plaintiff has not met the second prong of his burden that the Municipal Defendants took adverse action to deter him from exercising his rights and/or that there is a casual link between the alleged conduct and Plaintiff's constitutional exercises.

### 1.    Seizure and Destruction of Grievances

Plaintiff alleges that his grievances were seized and destroyed.[15]  Sec. Am. Compl. ¶ 5. Specifically, Plaintiff avers that "Defendant Abellos made another inmate throw away hundreds of inmate grievances by inmates who have filed lawsuits against the city, and [his] grievances were amongst those thrown away."  Id.  In supporting this claim, Plaintiff claims that his cell was "ransacked by Defendant Washington and his dog and [his] legal papers were taken, and have not been returned to him."  Id. ¶ 82.  Plaintiff also claims that because he "filed his grievances and a pro se lawsuit, in retaliation, [he] has been harassed and threatened by Defendants Abellos, Henry, May, Washington, and Brown on almost a daily basis."  Id. ¶ 74.

The Municipal Defendants assert that the record does not support Plaintiff's allegations in that he has offered a different order of events in his Complaint and his deposition testimony.  We agree.  According to the Complaint, Plaintiff first filed grievances and then this instant lawsuit. Id.  In the Complaint's version of events, Defendant Brown retaliated against Plaintiff for these filings by "violently chok[ing]" him.  Id. ¶¶ 77-78.  This was followed by Plaintiff visiting a

---

[15]It is notable that "[p]risoners do not have a constitutional right to prison grievance procedures." Heleva v. Kramer, 214 F. App'x 244, 247 (3d Cir. 2007).

social worker and being encouraged to file a grievance "in response to Defendant Brown's actions." Id. ¶¶ 78-81.  Afterwards, Plaintiff's cell was allegedly ransacked by Defendant Washington "in retaliation" for his filing a grievance against Defendant Brown.  Id. ¶ 82.  It was during this retaliation that Plaintiff alleges that his cell was ransacked by Defendant Washington and his K-9 unit, and that his legal papers were taken.  Id.  Plaintiff then claims that he filed a grievance in response to Defendant Washington's actions.  Id. ¶ 83.

During Plaintiff's deposition, his version of events included the claim that Defendant Brown poked him in the face and on his head.  (Lee Dep. at 123.)  Next, Plaintiff claims that Defendant Washington ransacked his cell, causing him to visit a social worker and file a grievance.  (Id. at 120, 124-126.)  It was only afterwards, on the next day, that Defendant Brown allegedly choked Plaintiff in retaliation for the grievance against Washington.  (Id. at 120-123.)

Moreover, we agree with the Municipal Defendants' assertion that Plaintiff's allegations cannot be paired with the documents he has offered.  (Defs.' Mot. Summ. J. at 14.)  According to Plaintiff, the ransacking of his cell occurred on March 9, 2013, and that envelopes containing copies of legal materials and copies of grievances previously filed, in addition to religious materials, were supposedly seized from his cell.  (Lee Dep. at 128-129.)  However, Plaintiff offers no explanation how he now has submitted a number of grievances as Exhibits in this case if such grievances were seized.[16]  (See Defs. Mot. Summ. J., Ex. AA, Inmate Grievance Forms dated 12/30/12, 1/1/13, 1/3/13, 1/4/13, 1/5/13, 1/23/13, 2/17/13, 2/20/13, and 3/13/13.)  Most telling is the fact that after this alleged ransacking took place, the record contains no Inmate

---

[16]Only two Inmate Grievances forms were obtained in discovery from the Municipal Defendants dated 1/23/13 and 2/17/13.  (See Defs.' Mot. Summ. J., Ex. BB.)

Grievance complaining of the ransacking of his cell and/or the taking of his materials.  The first Inmate Grievance in the record after the alleged ransacking on March 9, 2013, is from March 13, 2013.  (Id.)  However, this Grievance does not mention the seizure of any materials from his cell. (Id.)  Instead, this grievance demonstrates that Plaintiff wrongfully placed materials on the walls of his cell in violation of prison rules.  (Id.; Ex. DD, Brown Dep. at 8.)

In addition, Plaintiff testified that he filed a grievance[17] concerning this occurrence and wrote a letter to Defendant Abellos concerning such.  (Lee Dep. at 128-129.)  He also testified that he made copies of these documents and sent these copies to his attorney.  (Id.)  Plaintiff, however, offers no explanation why he or his attorney have not made such a grievance and/or letter part of this record.  For these reasons, we find that, even viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could not return a verdict in favor of the Plaintiff, and accordingly, summary judgment is granted in favor of the Municipal Defendants.[18]

## 2.    Bottom Bunk Privileges

Plaintiff next claims that he was forced to sleep on the top bunk in retaliation by the Municipal Defendants for filing grievances and seeking medical care.[19]  Sec. Am. Compl. ¶¶ 60, 89.  This claim, however, is not supported by the record, including Plaintiff's own testimony.

---

[17]He also avers in his Complaint that he "filed a grievance in response to Defendant Washington's actions."  Sec. Am. Compl. ¶ 83.

[18]Moreover, Plaintiff has produced no evidence to support his claim that Defendant Abellos "made another inmate throw away hundreds of inmate grievances by inmates who have filed lawsuits against the city."  Sec. Am. Compl. ¶ 5. Plaintiff also claims that he was physically assaulted in retaliation for exercising his constitutional rights.  See Sec. Am. Compl.  We will, however, address excessive force claims against several of the Defendant Correctional Officers, infra.

[19]Plaintiff also argues that he was denied medical care in retaliation for exercising his constitutional rights.  However, this claim is without merit because we have already determined that Plaintiff was not denied medical care.

Plaintiff testified:

> Throughout my incarceration I never physically received a bottom bunk, I was told that I was allowed to sleep on the bottom bunk due to my injury and that was only through the courtesy of the officers, as far as medical, I never received a yellow card, I never signed stating that I was receiving a bottom bunk.

(Lee Dep. at 28.)  Moreover, as noted earlier, Plaintiff was approved for "Bottom Bunk Accommodation" on January 9, 2013, which was to end on March 9, 2013, and was again approved for "Bottom Bunk Accommodation" on April 13, 2013, that was to end on July 9, 2013.  (Defs.' Mot. Summ. J. , Ex. X-Y.)  Accordingly, we dismiss this claim.

### 3.      Intercepted Phone Calls

Plaintiff's next contention is that the Municipal Defendants retaliated against him by intercepting his phone calls and changing his phone numbers.  Sec. Am. Compl. ¶ 84.  He alleges that "[i]n retaliation, [his] telephone calls to his civil attorney have been intercepted and turned off mid-conversation and other telephone numbers have been changed."  Id.  This claim is without merit because Plaintiff has not offered any evidence in support.  Thus, because the record is devoid of any evidence to support these bare-bone allegations, they are dismissed.

### 4.      Prison Job

Plaintiff claims that in retaliation for him exercising his constitutional rights, he was refused a prison job by the correctional staff.  Id. ¶ 88.  Plaintiff avers that "Defendant Henry told [him] if he wanted a prison job, he would have to drop his lawsuit," and that he was never given a job during the time he was incarcerated at CFCF.  Id.  However, Plaintiff has, again, offered no evidence in support of this contention.  Moreover, correctional staff are not responsible for placing inmates in prison jobs.  Defendant Henry testified that she has been employed at the PSS

21

for more than twenty years, and had been a lieutenant since 2008, and that correctional officers

do not assign jobs to inmates.  (Defs.' Mot. Summ. J., Ex. CC, Henry Dep. at 5.)  She testified:

> Q.  Okay.  Do you recall whether or not Mr. Lee had a job working
> in the prison at CFCF?
>
> A.  No, I don't recall.
>
> Q.  Do you ever recall stating to him personally that if you would
> drop the lawsuit, that you would be able to help him secure a job in
> the system?
>
> A.  No.
>
> Q.  As a lieutenant, are part of your duties assigning inmates with
> getting jobs?
>
> A.  No.
>
> Q.  How does an inmate go about getting a job in the prison?
>
> A.  They go to the social worker.  The social worker assigns jobs.
>
> Q.  Does the social worker contact anyone in authority, that is any correctional
> officers or supervisors, in order to determine whether that person is eligible to
> work?
>
> A.  No.
>
> Q.  Did you ever have any conversations, that you can recall, with
> Mr. Lee regarding his lawsuit with the City?
>
> A.  No.
>
> Q.  Do you ever recall Mr. Lee complaining to you about any other
> correctional officers?
>
> A.  No.

(Henry Dep. at 7-8.)  Because the correctional officers at CFCF and, in particular, Defendant

Henry, did not have the authority to assign inmates to jobs, Plaintiff's claim is without merit, and

is also dismissed.

### 5.      Harassment

Lastly, Plaintiff alleges that he was harassed, threatened, and called a "snitch" by correctional officers in retaliation for the filing of grievances and this lawsuit.  Sec. Am. Compl. ¶¶ 41, 90.  Plaintiff generally claims that "he had been the target of further violence at the hands of Correctional Officers at CFCF who have a custom of enforcing their 'don't snitch' on them policy by threatening, harassing and violently beating inmates in retaliation for filing grievances and complaints against them."  Id. ¶ 41.  In addition, Plaintiff asserts that "virtually every CFCF Correctional Officer that worked the unit where [he] was housed maliciously, recklessly and indifferently to his rights began telling other inmates that he was a 'snitch' causing [him] to be moved to another housing unit out of reasonable fears for his safety."  Id. ¶ 90.

To the extent that these claims involve excessive force against individual correctional officers, as noted earlier, we will address such claims, infra.  Moreover, as also discussed above, we have found no merit to Plaintiff's claims of seizure of papers, lack of bottom bunk accommodation, lack of medical care, phone tampering, and a lack of a prison job.  In addition, Plaintiff has failed to support his general claim against any Municipal Defendant that he was retaliated against for being a so-called "snitch."  Because Plaintiff cannot establish that the Municipal Defendants retaliated against him by threats and harassment for asserting his First Amendment rights, we grant summary judgment in favor of the Municipal Defendants on this claim.

### D.  Eighth Amendment Excessive Force Claims

Plaintiff alleges that he was attacked by several unnamed correctional officers on

September 8, 2012, and was choked by Defendant Brown on March 9, 2013.  Sec. Am. Compl. ¶¶ 38-40, 76-77.  In an Eighth Amendment excessive force claim, the key inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000) (citing Hudson v. McMillian, 503 U.S. 1, 7 (1992)).  "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" Hudson, 503 U.S. at 9-10 (quoting Whitley, 475 U.S. at 321).  We will first address the incident that occurred on September 8, 2012.

### 1.    The September 8, 2012 Incident

Specifically, Plaintiff avers that:

> On or about September 8, 2012, while imprisoned at CFCF, [he] was violently attacked by several Correctional Officers after returning from a counseling session with a mental health professional; during that violent attack, which was witnessed by several supervisory correctional officers, [he] was body slammed to concrete floor, hand and leg cuffed in a 'hog tie' manner sustaining serious bodily injuries.

Sec. Am. Compl. ¶ 38.

In determining whether a correctional officer has used excessive force in violation of the Eighth Amendment, courts look to several factors including: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; and (5) any efforts

made to temper the severity of a forceful response.  <u>Whitley</u>, 475 U.S. at 321; <u>see</u> <u>also</u> <u>Hudson</u>,

503 U.S. at 9.  The absence of serious injury, though relevant, is not a dispositive, additional

factor to be considered in the subjective analysis.  <u>See</u> <u>Brooks</u>, 204 F.3d at 104 (holding that

there is no fixed minimum quantum of injury that a prisoner must prove he suffered through

either objective or independent evidence in order to state a claim for excessive force).

 Regarding the first factor, it is not clear from the record whether there was a need for the

application of force.  The record is clear, however, that Plaintiff was causing a loud commotion

that necessitated the intervention of correctional officers to get Plaintiff under control.  Plaintiff

acknowledged such in his deposition.  He testified that he "banged on the door for the guard's

attention." (Lee Dep. at 118.)  He further stated that he "was being real, real loud, super loud to

get attention cause 50 cells and everyone is yelling talking and doing the same thing, want

different issues, so I was being loud banging on the gate." (<u>Id.</u>)

 As to the second factor, the relationship between the need and the amount of force that

was used, it is again unclear how much need for force was required.  <u>Whitely</u>, 475 U.S. at 32.

However, again, it is clear that Plaintiff's conduct required intervention by the correctional

officers.  With regard to the third factor, the extent of the injury inflicted, the record reflects that

Plaintiff's injuries were minor indicating that "de minimis" force was used.  Plaintiff testified

that he had "[m]inor blood" from this occurrence, but had "a lot of bruises, lot [sic] of scratches

in my wrists." (Lee Dep. at 18.)  However, Plaintiff was seen by prison health services for this

incident two days later on September 10, 2012, and a form called a "Heath Services Report on

Examination of Inmate Involved in Use of Force Incident" was completed by a registered nurse

which did not indicate any significant injuries. (Defs.' Mot. Summ. J., Ex. D.)  The form states

that Plaintiff was seen on September 10, 2012, for the incident which occurred on September 8, 2012.  (Id.)  It was reported that "[i]nmate denies any further injuries.  Inmate is awake, alert, and oriented.  No further injuries upon examination.  No signs/symptoms of infection.  No further treatment needed."  (Id.)  "Although de minimis injuries alone are not enough to justify a grant of summary judgment on an excessive force claim," in this instance, "they are indicative of the fact that the force utilized was also de minimis."  Washam v. Klopotoski, 403 F. App'x 636, 640 (3d Cir. 2010); see also Brooks, 204 F.3d at 108-09.  Thus, we find that this factor weighs heavily in favor of the Defendant Correctional Officers.

As to the fourth factor, the extent of the threat to the safety of staff and inmates, while there is no evidence in the record concerning the Defendant Correctional Officers' perception of a threat, it is reasonable to conclude that Plaintiff's conduct could certainly incite other inmates and cause a real threat to the safety of the guards, as well as the other inmates.  See Whitley, 475 U.S. at 321.  Finally, with regard to the fifth Whitley factor, efforts to temper the use of force, the record indicates that Plaintiff was told to stop banging on his cell, but he refused.  (Lee Dep. at 118.)  We, thus, weigh this factor slightly in favor of the Defendant Correctional Officers.

As noted above, in balancing the Whitley factors, "there is no constitutional violation for 'de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.'"  Brooks, 204 F.3d at 107 (quoting Hudson, 503 U.S. at 9-10).  We are of the opinion that the Whitley factors weigh in favor of the Defendant Correctional Officers, and we find that no reasonable jury could find that the de minimis force utilized by the Defendant Correctional Officers was "of a sort repugnant to the conscience of mankind" in violation of the Eighth Amendment.  Id.  Accordingly, we grant summary judgment to the Defendant

Correctional Officers as to the claim of excessive force on September 8, 2012.[20]

### 2.    The March 9, 2013 Incident

Plaintiff alleges that on or about March 9, 2013:

> Defendant Brown told [him] that he "heard him talking sh-t to
> Defendant May" and his lawsuit, and without provocation, legal
> justification or penological purpose began to violently choke [him]
> while calling him a "f- -king bitch" and stating that he "hates
> Muslims."

Id. ¶ 77.

At his deposition, Plaintiff was specifically asked about this paragraph of the Complaint.

(Lee Dep. at 120.)  Plaintiff testified that he believed that Defendant Brown came to his cell to

apologize or make "amends" for a prior incident where Defendant Brown became physical with

him.  (Id. at 120-21.)  Instead, Plaintiff testified, that Defendant Brown came to his cell to

retaliate against him because he believed Plaintiff was "being disrespectful to his warden or

deputy."  (Id. at 121.)  He stated further that Defendant Brown grabbed him, which prevented

him from walking away, and then, began to choke him telling him not to file any more grievances

and to stop being a "rat."  (Id. at 122.)

Plaintiff's allegations, however, against Defendant Brown are not supported by the

record.  As noted earlier, Plaintiff was certain at his deposition that he filed a grievance over this

incident.  He was asked, "[a]nd did you file a grievance after where you said you were choked."

Plaintiff responded, "[y]es, I did.  (Id. at 123.)  However, the record is devoid of Plaintiff filing

---

[20]Moreover, as noted, Plaintiff does not identify any of the correctional officers he claims were
involved in this incident, but rather, makes his allegations against unnamed PSS personnel.

a grievance concerning a choking incident with Defendant Brown.  The record indicates that

Plaintiff only filed one grievance in March 2013, and that was on March 13, 2013.  (Defs.' Mot.

Summ. J., Ex. AA.)  Although the information on the "Inmate Grievance Form" ("Grievance") is

handwritten and somewhat difficult to read, it is clear that Plaintiff is complaining about an

incident that involved him hanging some papers up on walls, either of his cell or in the area of his

cell, involving his Muslim faith that apparently was asking other inmates to "respect one another

more."  (Id.)  Plaintiff wrote in the Grievance that Defendant Brown told him to take the papers

down, and also said to him that "he hate [sic] that Muslim sh-t."  (Id.)  Plaintiff also wrote that

Defendant Brown punched or pushed him "in the face 4 for [sic] times," and called him a "rat."

(Id.)  However, it is clear from Plaintiff's account that this Grievance did not relate to the

"choking" allegations in the Complaint.  Sec. Am. Compl. ¶ 77.  This Grievance did not state

anything about Defendant Brown allegedly "violently choking" Plaintiff and/or calling him a

"f–king bitch," as he alleges in his Complaint."[21]  (Defs.' Mot. Summ. J., Ex. AA.)  Moreover,

the Grievance refers to a totally different fact scenario than what Plaintiff alleges in the

Complaint.  As noted, the Complaint alleges that Defendant Brown attacked and began choking

Plaintiff when he heard him talking "sh-t" to Defendant May.  Sec. Am. Compl. ¶ 77.  Whereas,

the Grievance alleges that Defendant Brown punched or pushed him over Plaintiff hanging

literature in his cell.[22]  (Defs.' Mot. Summ. J., Ex. AA.)

---

[21]It is notable that Plaintiff's Grievance never stated that Defendant Brown told Plaintiff that he
hated Muslims, but that he hated that "Muslim Sh-t," apparently referring to Plaintiff's actions in hanging
up papers asking other inmates to "respect one another more."  (Defs.' Mot. Summ. J., Ex. AA.)

[22]Although we do not find it determinative, we note that Plaintiff cannot even establish that
Defendant Brown was in the same building or his cell area when he committed the actions alleged.
Defendant Brown testified that during the period from December 2012 to December 2013, he worked a

If such a Grievance exists, alleging a choking incident, Plaintiff has not produced such or offered any explanation why he has not.  While, Plaintiff makes very serious allegations against Defendant Brown that would, in many cases, withstand a summary judgment motion, they cannot do so here because Plaintiff's allegations are simply not supported by the record.  A "moving party is entitled to summary judgment where no reasonable resolution of conflicting evidence and inferences therefrom could result in a judgment for the non-moving party."  Schwartz v. Hospital of University of Penna., No. 88-4865, 1993 WL 153810, at *2 (E.D. Pa. May 7, 1993) (citing Bank of Am. Nat'l Trust and Sav. Ass'n v. Hotel Rittenhouse Assoc., 595 F. Supp. 800, 802 (E.D. Pa. 1986)).  Here, based on the record, we are of the opinion that no reasonable jury could infer that Defendant Brown engaged in the conduct alleged.  Thus, we grant summary judgment on this claim.

### E.  State Law Claims of Assault and Battery

Plaintiff also asserts state law claims of assault and battery stemming from the two incidents discussed above.  These claims are also without merit.  "Assault is an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person."  Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994).  A battery is defined as a

---

regular shift in an area called the "receiving room" which is apparently not in the same vicinity at CFCF as Plaintiff's cell.  (Defs.' Mot. Summ. J., Ex. DD, Brown Dep. at 6-7.)  Defendant Brown also testified that he did not recall an inmate ever accusing him of choking him, and that he never choked any inmate.  (Id. at 6-7.)  Furthermore, Defendant Brown had no recollection of Plaintiff and only recalled a complaint against him from an inmate alleging that he "slammed" an inmate against the "receiving room" wall.  (Id. at 11.)  Defendant Brown testified that he never "slammed" any inmate against this wall.  (Id. at 7.)  Moreover, he stated that he had no personal feelings toward Muslims or "anybody practicing any religion," and that he tells inmates all the time to remove any paperwork from their cell walls because it is against prison regulations to have anything on the walls.  (Id. at 7-8.)

"harmful or offensive contact" with the person of another. <u>C.C.H. v. Phila. Phillies, Inc.</u>, 940

A.2d 336, 340 (Pa. 2008). In Pennsylvania, the reasonableness of the force used determines

whether the officer's conduct constitutes an assault and battery. <u>Moore v. Vangelo</u>, 222 F. App'x

167, 172 (3d Cir. 2007) (citing <u>Renk</u>, 641 A.2d at 293).

Regarding the September 8, 2008 incident, as discussed above, we found that, not only

was the force reasonable in reaction to the situation, but that the force used was "de minimus."

<u>See</u> <u>Brooks</u>, 204 F.3d at 107. Moreover, as noted, Plaintiff has failed to identify any correctional

officers who allegedly assaulted him. Consequently, this claim fails. Likewise, for the reasons

discussed above, an assault and battery claim fails against Defendant Brown regarding the March

13, 2013 incident because the record simply does not support Plaintiff's allegations. Thus, we

grant summary judgment on this claim as well.

### F.     Intentional Infliction of Emotional Distress Claim Against the Municipal Defendants

Plaintiff alleges a claim of intentional infliction of emotional distress against individual

Municipal Defendants. To prove a claim of intentional infliction of emotional distress, the

following elements must be established: (1) the conduct must be extreme and outrageous; (2) it

must be intentional or reckless; (3) it must cause emotional distress; and (4) that distress must be

severe. <u>Hoy v. Angelone</u>, 691 A.2d 476, 482 (Pa. Super. 1997). Moreover, the conduct:

> must be so outrageous in character, and so extreme in degree, as to go
> beyond all possible bounds of decency, and to be regarded as atrocious,
> and utterly intolerable in any civilized society . . . [I]t has not been enough
> that the defendant has acted with intent which is tortious or even criminal,
> or that he has intended to inflict emotional distress, or even that his
> conduct has been characterized by "malice," or a degree of aggravation
> that would entitle the plaintiff to punitive damages for another tort.

30

Reardon v. Allegheny College, 926 A.2d 477, 488 (Pa. Super. 2007) (quoting Hoy, 720 A.2d at 754). In addition, under Pennsylvania law, for Plaintiff to recover on this claim, he must prove the existence of the alleged emotional distress by "expert medical confirmation that the plaintiff actually suffered the claimed distress." Kazatsky v. King David Memorial Park, Inc., 527 A.2d 988, 996 (Pa. 1987).

Here, the record is devoid of any medical evidence supporting a claim of emotional distress. Therefore, under Pennsylvania law, Plaintiff cannot recover on this claim. In addition, Plaintiff has failed to produce evidence that any action(s) on the part of the individual Municipal Defendants was "extreme and outrageous." See Hoy, 691 A.2d at 482. We, thus, grant summary judgment on this claim.

## G.    Supervisory Liability

Plaintiff alleges that all the named "Municipal Defendants acted in various supervisory capacities at PPS and CFCF," and that they are liable for damages under §1983. (Pl.'s Resp. at 25.) Plaintiff, citing Carter v. City of Philadelphia, 181 F.3d 339, 357 (3d Cir. 1999), asserts that "liability under § 1983 will lie against supervisors whose conduct amounts to deliberate indifference to the rights of persons with whom subordinates will come into contact." (Id. at 25-26.)

"It is well settled that the doctrine of respondeat superior may not be employed to impose § 1983 liability on a supervisor for the conduct of a subordinate which violates a citizen's constitutional rights." Blanche Road Corp. v. Bensalem Twp., 57 F.3d 253, 263 (3d Cir. 1995); Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). Instead, for a supervisor to face

liability, that supervisor must be personally involved in the alleged wrongs.  Id.  "Personal

involvement can be shown through allegations of personal direction or of actual knowledge and

acquiescence.  Allegations of participation or actual knowledge and acquiescence, however, must

be made with appropriate particularity."  Rode, 845 F.2d at 1207.  For a failure to supervise

claim, the plaintiff must prove that the defendant "exhibited deliberate indifference to the plight

of the person deprived."  Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989).  To show

deliberate indifference, the plaintiff must "identify a specific supervisory practice that the

defendant failed to employ" and "allege 'both (1) contemporaneous knowledge of the offending

incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which

the supervisor's inaction could be found to have communicated a message of approval.'" C.H. ex

rel. Z.H. v. Olivia, 226 F.3d 198, 202 (3d Cir. 2000) (quoting Bonenberger v. Plymouth Twp.,

132 F.3d 20, 25 (3d Cir. 1997)).

### 1.      Defendant Giorla

 Plaintiff asserts that Defendant Giorla, as Commissioner of PPS, was a decision-maker at

PPS.  (Pl.'s Resp. at 26.)  He contends that Defendant Giorla's "presence at PPS as the highest

ranking official tends to suggest that he knew about the lack of orthopedic care for inmates that

was the driving force behind [his] injury," and "[i]t also suggests that he knew about inmates

including [himself] being injured due to the absence of bunk bed ladders, but did nothing to

correct those conditions."[23]  (Id. at 27.)

---

[23]Regarding liability as to the Defendant supervisors that Plaintiff has sued, we, again, note that
we have already determined that none of these Defendants were "deliberately indifferent" to Plaintiff's
serious medical needs.  In addition, we have determined that the lack of a ladder for Plaintiff's bunk bed
was not a constitutional violation.

Plaintiff cannot merely speculate that a defendant may have had knowledge of or personal involvement in the deprivation of his rights.  Atkinson v. Taylor, 316 F.3d 257, 271 (3d Cir. 2003); Rode, 845 F.2d at 1208.  Here, this is exactly what Plaintiff has done.  Plaintiff argues that Defendant Giorla's position "suggests" personal involvement, knowledge, and/or acquiescence.  (Pl.'s Resp. at 26.)  Plaintiff, however, has simply failed to present any evidence of such.  Accordingly, we grant summary judgment on this claim.

### 2.    Defendant Gainey

Plaintiff claims that Defendant Gainey was a defendant in other lawsuits concerning the dangers posed by the absence of ladders on bunk beds, and that this is evidence that he was indifferent to that risk.  (Id. at 27.)  However, because the failure to provide prisoners with a ladder to reach the top bunk of a bunk bed is not sufficiently serious to rise to the level of a constitutional violation, this claim fails.  See Williams, 2013 WL 4787223, at *15; Nixon, 2013 WL 692643, at *1; Diaz, 2013 WL 334796, at *1.

### 3.    Defendant Dr. Herdman

Plaintiff alleges that Defendant Dr. Herdman, as the Chief Medical Officer of the PPS, was "personally involved in the creation of the City and CFCF's written policy of denying inmates Motrin." (Pl.'s Resp. at 28.)  Plaintiff claims that he was denied Motrin for his pain. (Id.)  The record, however, is devoid of evidence that Plaintiff was denied Motrin.  Moreover, Plaintiff has failed to offer any support that denial of Motrin or a similar pain killer to an inmate constitutes deliberate indifference to a serious medical need.  See Estelle, 429 U.S. at 106.  In addition, Plaintiff has failed to support his contention that Defendant Dr. Herdman had personal

involvement, knowledge, and/or acquiescence to the denial of Motrin to Plaintiff or any other inmate at CFCF.  See C.H. ex rel. Z.H., 226 F.3d at 202.  Thus, this claim is dismissed as being without merit.

### 4.        Defendants Delaney and Abellos

Plaintiff next asserts that he filed numerous "grievances which were supposed to be reviewed by the CFCF Warden and Deputy Warden, Delaney and Abellos," but were not.  (Pl.'s Resp. at 28.)  Plaintiff claims that Defendant Delaney and Defendant Abellos did not respond to his grievances, and that the fact that these Defendants stopped "responding to his grievances arguably suggests that [they were] ratifying the conduct of [their] subordinates, which contributed to the creation of an environment in which the assault(s) on [him] were bound to occur."  (Id. at 29.)

However, even assuming that Plaintiff's assertions are true, these claims are without a basis in law and fact.  "Prisoners do not have a constitutional right to prison grievance procedures."  Heleva v. Kramer, 214 F. App'x 244, 247 (3d Cir. 2007) (citing Massey v. Helman, 259 F.3d 641, 647 (7th Cir.2001)); see also Williams, 2013 WL 4787223, at *19.  "[W]hen the claim underlying the administrative grievance process involves a constitutional right, the prisoner's right to petition the government for redress is the right to access the courts, which is not compromised by the prison's refusal to entertain his grievance."  Winn v. Dep't of Corr., 340 F. App'x 757, 759 (3d Cir. 2009) (quoting Flick v. Alba, 932, F.2d 728, 729 (8th Cir. 1991)); see also Williams, 2013 WL 4787223 at *19.

Here, Plaintiff clearly has had access to this Court to assert his claims in the form of this

instant action.  Thus, because Defendants' "alleged failure to process or respond to [Plaintiff's] grievances did not violate his rights to due process and is not actionable," summary judgment is granted on these claims.  See Stringer v. Bureau of Prisons, 145 F. App'x 751, 75 (3d Cir. 2005).

### 5.    Defendant May

Plaintiff alleges that Defendant May was somehow involved in Defendant Brown's attack of him.  (Pl.'s Resp. at 29.)  Plaintiff's claim is premised on his allegation that Defendant Brown's attack on him was immediately preceded by his statement: "I heard you were talking sh-t" to Defendant May about suing him.  (Id.)  Summary judgment is granted on this claim for several reasons.  First, we determined that Plaintiff has not submitted sufficient evidence that Defendant Brown attacked him and violated his constitutional rights.  Second, Plaintiff has failed to support his contention that Defendant May had personal involvement, knowledge, and/or acquiescence to Defendant Brown's alleged attack.  See C.H. ex rel. Z.H., 226 F.3d at 202.

### 6.    Defendant Henry

Finally, Plaintiff asserts that a jury could infer that "Defendant Henry's promises to return [his] legal papers" and "failure to respond to his complaints about his cell being ransacked and Defendant Brown's attack arguably suggests that [she] was ratifying the conduct of her subordinates."  (Pl.'s Resp. at 30.)  However, once again, the record is devoid of any evidence that Defendant May had any personal involvement or knowledge of these alleged actions.  See C.H. ex rel. Z.H., 226 F.3d at 202.  Accordingly, summary judgment is granted as to this claim as well.

35

H.     **Conspiracy Claim**

Plaintiff asserts that he has "clearly established that Defendant Brown acted in concert

with another correctional officer, Defendant May, and other supervisory PPS officials conspired

with Defendant Brown to cover-up his unlawful actions."  (Pl.'s Resp. at 32-33.)  Plaintiff further

argues that the "fact that the Warden allegedly stopped responding to the grievances arguably

suggests that he was ratifying the conduct of his subordinates, which contributed to the creation

of an environment in which the assault on [him] was bound to occur."  (Id. at 33.)

"In order to prevail on a conspiracy claim under § 1983, a plaintiff must prove that

persons acting under color of state law conspired to deprive him of a federal protected right."

Ashton v. City of Uniontown, 459 F. App'x 185, 190 (3d Cir. 2012) (quoting Ridgewood Bd. of

Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 254 (3d Cir. 1999)).  Plaintiff must plead sufficient

facts to infer an agreement to act or concerted activity by the defendants alleged to have engaged

in the conspiracy; merely asserting that the defendants "act[ed] in concert and conspiracy" is

insufficient.  Id. at 191.  Similarly, "[c]ivil rights conspiracy claims that are based only on

suspicion and speculation instead of fact do not state a claim."  Jackson v. Gordon, 145 F. App'x

774, 778 (3d Cir. 2005).  Plaintiff must show that the state actor defendants "somehow reached

an understanding to deny [him] his rights under [Section] 1983."  Kost v. Kozakiewicz, 1 F.3d

176, 185 (3d Cir. 1993) (citing Adickes v. S .H. Kress & Co., 398 U.S. 144, 150 (1970)).

Here, Plaintiff's conspiracy claim is without merit because, as discussed earlier, he has

failed to establish any deprivation of a federal civil right in violation of Section 1983.  "[S]ince

we have concluded that the federal civil rights claim[ ] which [is] the object of the conspiracy

must be dismissed, the alleged conspiracy to violate federal civil rights must also be dismissed because no federally protected right exists that is the object of the conspiracy" and "one element of a conspiracy cause of action has not been satisfied." Ashton, 459 F. App'x at 191. Accordingly, summary judgment is granted as to this cause of action.

## I.      Claims Against the City

### 1.      Municipal Liability Under Section 1983

"A municipality cannot be held liable solely because it employs a tortfeasor." Monell v. N.Y. City Dept. of Soc. Servs., 436 U.S. 658, 691 (1978). Instead, the plaintiff must assert that an actual policy or custom of the municipality was the cause of the constitutional deprivation. Id. In order to sufficiently allege "custom" for Monell purposes, a plaintiff must allege that the "practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law." Id. A municipal custom is a "persistent and widespread" practice of municipal action that is "so permanent and well settled as to constitute a custom or usage with the force of law." Id. It is well established that "[p]roof of a single instance of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." City of Okla. City v. Tuttle, 471 U.S. 808, 820 (1985); Brown v. City of Pittsburgh, 586 F.3d 263, 292 (3d Cir. 2009).

A government policy or custom can be established in two ways. Policy is made when a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action" issues an official proclamation, policy, or edict. Pembaur v. City of Cincinnati, 475 U.S.

469, 481 (1986). "Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law," Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990) (citing Andrews, 895 F.2d at 1480), and "may be established by proof of knowledge and acquiescence." Fletcher v. O'Donnell, 867 F.2d 791, 793-94 (3d Cir. 1989).

In Natale v. Camden Cnty. Correctional Facility,  the Third Circuit identified three situations where acts of a government employee or other state actor may be deemed to be the result of a policy or custom of the entity for which the employee works, thereby rendering the entity liable under 42 U.S.C. § 1983.  Natale, 318 F.3d 575, 584 (3d Cir. 2003).  First, liability will extend to the entity when the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act is an implementation of that policy.  Id.  Second, liability extends when no rule has been announced as policy but federal law has been violated by an act of the policymaker itself.  Id.  Third, liability will extend when the policymaker has failed to act affirmatively at all, and the need to take some action to control the agents of the government was so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.  Id.

Here, we find that Plaintiff has failed to submit any specific evidence that the City has any custom or policy which was the proximate cause of the following alleged constitutional violations that were discussed above: (1) violations of his constitutional rights relating to his medical care; (2) violations of his First Amendment rights by retaliation for filing grievances and

a lawsuit; (3) violations of his First Amendment rights by removing religious materials from his cell; and (4) violations of his Eighth Amendment to be free from cruel and unusual punishment relating to alleged excessive force by Defendant Brown and other unnamed correctional officers.[24]  We, thus, grant summary judgment on this claim.

## 2.    State Created Danger Claim

Plaintiff next alleges a state-created danger claim.  He avers that the City contracted with Defendant Corizon to provide health care services that the City knew or should have known Defendant Corizon was not qualified to provide or would not provide in a lawful manner.  Sec. Am. Compl. ¶ 100.  He also argues that, but for the City's contract with Defendant Corizon, he would not have been given inadequate medical treatment.  Id. 102.

The state-created danger theory is an exception to the general rule that "[t]here is no affirmative right to governmental aid or protection under the Due Process Clause of the Fourteenth Amendment."  Ye v. United States, 484 F.3d 634, 636 (3d Cir. 2007).  The theory recognizes a substantive due process violation may occur "when state authority is affirmatively employed in a manner that injures a citizen or renders him 'more vulnerable to injury from another source than he or she would have been in the absence of state intervention.'"  Bright v. Westmoreland Cnty., 443 F.3d 276, 281 (3d Cir. 2006) (quoting Schieber v. City of Phila., 320 F.3d 409, 416 (3d Cir. 2003)).

The state-created danger theory requires a plaintiff to establish each element of this test:

---

[24]It is notable that the City asserts that Plaintiff did not conduct any Monell discovery during the discovery period in that he did not take depositions of any corporate designee of the City or any other high level supervisor named Defendant in this action.  (Defs.' Mot. Summ. J. at 31.)

"(1) the harm ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all." Kaucher v. Cnty. of Bucks, 455 F.3d 418, 431 (3d Cir. 2006) (citing Bright, 443 F.3d at 281).

As stated above, Plaintiff must establish each element of this test. Id. Here, we need only address the third element. In regard to this element, the Third Circuit has held that "[i]n a case where state actors have the time to make unhurried judgments, the level of culpability required to shock the conscience is deliberate indifference." Navoliov. Lawrence Cnty., 406 F. App'x 619, 624 (citing Sanford v. Stiles, 456 F.3d 298, 309 (3d Cir. 2006)). In the instant case, there is no question that Plaintiff is alleging that the Municipal Defendants made "unhurried judgments" in, not only hiring and retaining Defendant Corizon as its prison health care provider, but also in treating his knee injuries. Thus, the standard is deliberate indifference. Id. Because we have already determined that none of the Municipal Defendants were deliberately indifferent to Plaintiff's serious medical needs, a state created danger claim against the City fails as well. For these reasons, we dismiss this cause of action.

### 3.      Premises Liability Claim

Plaintiff also attempts to state a claim of premises' liability, sounding in tort, against the

City.  See Sec. Am. Compl. ¶¶ 108-112.  Plaintiff claims that he was injured because the City knowingly and recklessly failed to provide a ladder for his top bunk at CFCF.  Id.  Tort liability of the City is governed and limited by the Political Subdivision Tort Claim Act, 42 Pa. C.S.A. § 8541 et. seq. ("Tort Claims Act").  Plaintiff can prevail against the City only if the damages would be recoverable under common law and if the negligent acts imposing liability fall within one of eight narrowly drawn exceptions to immunity.[25]  Id.  Because Plaintiff grounds his claim in a premises liability theory, the exception at issue in this case is the "care, custody, and control of real property."  See 42 Pa. C.S. § 8542(b)(3).

It is well-settled that "inmates are analogous to invitees for purposes of determining the duty of care owed by prison officials."  Cochrane v. Kopko, 975 A.2d 1203, 1206 (Pa. Cmwlth. 2009); Graf v. County of Northampton, 654 A.2d 131, 134 (Pa. Cmwlth. 1995).  A possessor of land owes no duty to protect an invitee from "obvious and avoidable dangers."  Id.  Moreover, an invitee may assume the "risk of injury from a known and avoidable danger" when they are on the possessor's land.[26]  Id.  Here, Plaintiff certainly knew that his bunk had no ladder.  See Sec. Am. Compl. ¶¶ 108-112.  It is also clear that Plaintiff assumed the risk of possible injury from getting down from a top bunk.  He testified that:

> [A]s I was getting down my cell mate who slept underneath me

---

[25]Section 8542 provides for a limited waiver of immunity which are: (1) operation of motor vehicles; (2) care, custody, and control of personal property; (3) care, custody, and control of real property; (4) dangerous conditions of trees, traffic control and street lighting; (5) dangerous conditions of utility service facilities; (6) dangerous conditions of streets; (7) dangerous conditions of sidewalks; and (8) care, custody, and control of animals.  42 Pa. C.S. § 8542(b)(1)-(8).

[26]As discussed above, we have already noted ample judicial precedent finding that the PPS's failure to provide prisoners with a ladder to reach the top bunk of a bunk bed is not sufficiently serious to rise to the level of a constitutional violation.  See Williams, 2013 WL 4787223, at *15.

> was getting up at the same time and beings [sic] though the bunk
> bed is so high have [sic] to use a chair to lower myself down to the
> floor but me not paying attention to him sitting up underneath me,
> as I was sliding down forward, he told me, ho, watch your feet, and
> it really startled me a little bit because I thought I was going to
> come down on him so as I was trying to, you know, like not hit him
> or fall on him, I tried to use one leg on a chair and I slipped and
> fell.

(Lee Dep. at 21-22.)  Because Plaintiff was aware of the danger and admitted to "not paying

attention" to the risk, this claim is without basis in the record, and is dismissed.[27]

## IV.   CONCLUSION

In accordance with the above, we grant summary judgment in favor of the Municipal

Defendants on all causes of action.  In addition, we grant summary judgment in favor of the City

on all causes of action as well.  We, therefore, grant the instant Summary Judgment in its

entirety.  All claims against these Defendants are dismissed.

An appropriate Order follows.

---

[27]Plaintiff also asserts a claim of intentional infliction of emotional distress against the City. However, this claim is an intentional tort, and tort liability of the City is governed by the Tort Claims Act.  See 42 Pa. C.S.A. § 8541 et. seq.  This Act provides immunity for the City from intentional torts. Id.; see also Panas v. City of Philadelphia, 871 F. Supp. 2d 370, 376 (E.D. Pa. 2012).  Accordingly, summary judgment is granted on this claim.